# Exhibit E

# EMPLOYMENT AGREEMENT

This Agreement ("Agreement") is made and entered into as of this $\cancel{3}$ (2 day of June, 2005 (the "Agreement Date"), by and between Reuben Harley ("Employee") and Mitchell & Ness Nostalgia Company (the "Company").

## RECITALS

A.     The Company is engaged in the business of designing, manufacturing, marketing and distributing licensed replica sports apparel and branded sportswear, outerwear and accessories (the "Business").

B.     In the operation of the Business, the Company has customers throughout the United States (collectively the "Customers").

C.     The Company desires to retain the services and employment of Employee, and Employee is willing to be employed by the Company upon the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the foregoing premises and the mutual covenants contained herein, and intending to be legally bound hereby, the parties hereto agree as follows:

1.  <u>Employment</u>.  The Company agrees to employ Employee, and Employee agrees to be employed by the Company, for the period commencing on the Agreement Date and terminating at midnight on the day prior to the first annual anniversary of the Agreement Date (the "Initial Term"), unless such employment is otherwise extended or earlier terminated as provided herein.  The Initial Term may be extended by Employee for an additional period of one (1) year commencing at the end of the Initial Term (the "Extension Term"), provided that (a) the Initial Term has not been terminated as provided herein and (b) the Employee provides the Company written notice of such extension no later than sixty (60) days prior to the expiration of the Initial Term.  (The Initial Term and any Extension Term are hereinafter collectively referred to as the "Term").

2.  <u>Duties</u>.  Employee's duties and responsibilities under this Agreement shall be all of those duties and responsibilities that the Company, in its sole discretion, determines and assigns to Employee.  Employee's superiors shall include Peter Capolino and Fran Deitrich. Employee's duties and responsibilities may include, but are not limited to, those set forth in <u>Attachment 1</u> hereto. Employee agrees to devote his best efforts, and all his business time, attention, skill, and efforts, to the business and affairs of the Company on a full-time basis in order to discharge his duties and responsibilities.  The Company, and Employee's superiors within the Company, shall retain full direction and control of the means and methods by which Employee performs the services for which he is employed hereunder.  Employee will conduct himself in a manner consistent with the Company's image and professionalism.  Except to the extent contradicted by an express provision of this Agreement, Employee will be subject to the Company's applicable policies, rules, and regulations, including all personnel policies, practices,

and procedures, as they may exist now or may be amended or supplemented from time to time, all of which are hereby incorporated herein by reference.

3. Compensation and Other Benefits.

A. Compensation. Employee shall be paid a salary during the period of his employment with the Company as provided herein at the rate and on the basis set forth in Attachment 1 hereto. Employee understands and agrees that Employee's salary may be adjusted from time to time at Employer's sole discretion without affecting any other provision of this Agreement, except that Employee's salary may not be decreased without the mutual agreement of Company and Employee.

B. Other Benefits. Company may adopt or continue in force benefits plans for the benefit of its employees or certain of its employees. Company may terminate any or all such plans at any time and may choose not to adopt any additional plans. Employee's rights under any benefits plans now in force or later adopted by Company shall be governed solely by their terms. In addition to the foregoing, the Company may elect, in its sole discretion, to provide Employee with a Company credit card; provided (i) Employee's use of such credit card shall be subject to Section 3.C below, (ii) Employee shall use such credit card for ordinary and necessary business expenses only, and (iii) Company may choose to terminate Employee's credit card privileges at any time.

C. Reimbursement of Expenses. The Company will reimburse Employee for cost of ordinary and necessary travel and other out-of-pocket expenses incurred by him in connection with the performance of his obligations under this Agreement; provided that Employee shall not incur any individual expense in excess of $500.00 or cumulative expenses in excess of $1,000.00 without the prior written consent of Peter Capolino. In order for Employee to be entitled to reimbursement for any expenses (whether or not pre-authorized), Employee shall properly account for and submit appropriate documentation with respect to all such expenses.

4. Termination.

A. Termination for Permanent Disability.

i. Without limiting the Company's right to terminate Employee pursuant to Section 4B, 4C or 4D hereof, the Company may terminate Employee's employment hereunder at any time as a result of Employee's Permanent Disability upon written notice to Employee. For purposes of this Agreement, a "Permanent Disability" shall be deemed to have occurred upon the first to occur of the following events: (i) if Employee, as a result of a mental or physical condition, injury, sickness or incapacity, has become incapable of satisfactorily (as reasonably determined by the Company) discharging the essential functions of Employee's duties for ninety (90) consecutive days during any period of twelve (12) consecutive months; (ii) the Employee becoming entitled to benefits under any long-term disability plan or program, whether maintained by the Company or the Employee; or (iii) the adjudication of such Employee as an incompetent person by a court of competent jurisdiction.

ii. In the event of a termination of Employee's employment hereunder pursuant to Section 4A(i), Employee will be entitled to receive all accrued and unpaid (as of the date of such termination) Base Salary, Benefits and Bonus, including payment prescribed under any disability plan or arrangement provided by the Company in which he is a participant or to which he is a party as an employee of the Company. Except as specifically set forth in this Section 4A(ii), the Company shall have no liability or obligation to Employee for compensation or benefits hereunder by reason of such termination.

B. <u>Termination by Death</u>. In the event that Employee dies while employed by the Company, Employee's employment hereunder shall be terminated thereby and the Company shall pay to Employee's executors, legal representatives or administrators an amount equal to all accrued and unpaid (as of the date of such termination) Base Salary, Benefits and Bonus. Except as specifically set forth in this Section 4B, the Company shall have no liability or obligation hereunder to Employee's executors, legal representatives, administrators, heirs or assigns or any other person claiming under or through him by reason of Employee's death, except that Employee's executors, legal representatives or administrators will be entitled to receive the payment prescribed under any life insurance plan in which he is a participant as an employee of the Company.

C. <u>Termination for Cause; Voluntary Termination</u>.

i. The Company may terminate Employee's employment hereunder at any time for "Cause" upon written notice to Employee. In addition, the Employee may voluntarily terminate his employment hereunder at any time following thirty (30) days prior written notice to the Company. For purposes of this Agreement, the term "Cause" shall mean: (i) Employee's failure or refusal to materially perform his duties hereunder or to follow a lawful directive of any Officer of the Company; (ii) any material breach by the Employee of the terms of this Agreement; (iii) other conduct of Employee involving any willful and material misconduct with respect to or against the Company or its property or any of its personnel; or (iv) Employee being charged with any felony or crime involving moral turpitude (other than a routine traffic violation). Notwithstanding anything set forth herein, if the Company determines that the breach can be cured by the Employee, then prior to the Company having the right to discharge Employee pursuant to clause (i) or (ii) above, the Company shall first be required to give Employee prior written notice of any alleged breach under Sections 4C(i) or (ii) above (the "Notice"), and for such Notice to be effective it must specify in reasonable detail the nature of, and facts and circumstances relative to, such alleged Cause, and a period during which the Employee will be given a reasonable opportunity to cure (which period shall not exceed three (3) months following the date of such Notice) and in the event Employee cures such alleged breach, the Notice shall automatically be deemed withdrawn.

ii. In the event of a termination of Employee's employment hereunder pursuant to Section 4C, Employee shall be entitled to receive all accrued but unpaid (as of the effective date of such termination) Base Salary and Benefits. All Base Salary, Benefits and Bonuses shall cease at the time of such termination. Except as specifically set forth in this Section 4C, the Company shall have no liability or obligation hereunder by reason of such termination.

D. <u>Termination without Cause</u>.

    i.  The Company may terminate Employee's employment hereunder at any time, for any reason, without Cause, effective upon the date designated by the Company upon thirty (30) days prior written notice to Employee.

    ii.  In the event of a termination of Employee's employment hereunder pursuant to Section 4D(i), Employee shall be entitled to: (i) receive all accrued but unpaid (as of the effective date of such termination) Base Salary, Benefits and Bonuses and (ii) the continuation of his Base Salary for the remainder of the Initial Term, if the Initial Term has not already expired; provided, however, that the payments outlined in this subparagraph (ii) shall (a) be contingent upon the Employee executing and not revoking a release of all claims in form and substance satisfactory to Company and (b) be paid as provided in Section 3 of <u>Attachment A</u> hereto. All Base Salary, Benefits and Bonuses shall cease at the time of such termination, subject to the terms of any benefit or compensation plan then in force and applicable to Employee. Except as specifically set forth in this Section 4D, the Company shall have no liability or obligation hereunder by reason of such termination.

    5. <u>Employment Screening and Other Policies and Restrictions of the Customers</u>. Because of the nature of the Company's business, Employee from time to time will be required to work closely with one or more Customers. Employee also understands and acknowledges that one or more Customers may require the Company (inclusive of its employees) to comply with their respective screening and information protection practices. Employee agrees that he will be subject to and further agrees to comply with all policies, rules, restrictions and regulations of such Customer(s), including all personnel policies, practices, and procedures, and specifically including any and all background checks, drug testing, and other such forms of employment screening, to the extent that such policies, practices, and procedures are reasonably related, in the Company's sole discretion, to the discharge of Employee's duties and responsibilities hereunder. In addition, Employee understands and agrees that he will be subject to and further agrees to execute, become bound by and comply with any and all agreements as may be required by any of the Company's Customers pertaining to confidentiality and non-disclosure, non-solicitation and non-competition agreements.

    6. <u>Ownership Information Disclosed</u>. All ideas, concepts, information, and written material disclosed to Employee by the Company, or acquired from a Customer or prospective Customer of the Company, are and shall remain the sole and exclusive property and proprietary information of the Company or such Customer, and are disclosed in confidence by the Company or such Customers in reliance on Employee's agreement to maintain them in confidence and not to use or disclose them to any other person except in furtherance of the Company's Business.

    7. <u>Confidentiality, Nondisclosure and Noncompetition</u>. In recognition of the highly competitive nature of the Company's Business, Employee agrees to execute, concurrent with this Agreement, the Company's Confidentiality, Nondisclosure and Noncompetition Agreement, which is attached hereto as <u>Attachment 2</u> and incorporated herein by this reference. Employee acknowledges and agrees that a breach of any of the provisions of <u>Attachment 2</u> may cause irreparable harm to the Company which may not be adequately compensated by damages.

In recognition of that fact, in the event of a breach or threatened breach by Employee of any of the provisions of Attachment 2, it is agreed that, in addition to its remedies at law, the Company shall be entitled to equitable relief in the form of specific performance, temporary restraining order, temporary or permanent injunction or any other equitable remedy which may then be available. In the event of any such breach or threatened breach, at the election of the Company, all rights of Employee under this Agreement shall thereupon terminate. Nothing herein contained shall be construed as prohibiting the Company from pursuing any other remedies available to it for such breach or threatened breach, including the recovery of damages from Employee.

8. General Provisions.

A. All notices, demands and other communications which are required or permitted to be given or made by any party to the other in connection with this Agreement will be in writing, will be deemed to have been given when posted by certified or registered mail or when receipt by a courier express, telegram, cable, telex or facsimile has been acknowledged to the address of the party to receive such notice set forth in this Agreement or any attachment.

B. This Agreement, including any and all schedules, attachments, and other documents incorporated herein and made a part hereof, supersedes any and all prior agreements, understandings and negotiations relating to the subject matter hereof and constitutes the entire agreement of the parties relating to such subject matter. This Agreement may not be waived, changed, modified, extended or discharged orally but only by an agreement in writing and signed by the party against whom enforcement of any such waiver, change, modification, extension or discharge is sought. No promise, understanding, representation, inducement, condition or warranty not set forth herein and/or made a part hereof has been made or relied on by any party hereto. The waiver by any party of a breach of any provision of this Agreement by the other will not operate or be construed as a waiver of any subsequent breach by such other party. Each party hereby acknowledges and agrees that it had full opportunity for counsel of choice to participate in the negotiation of this Agreement and that it fully understands each of the terms and provisions of this Agreement.

C. Any termination of this Agreement shall not affect Section 7 above and the provisions of Attachment 2, both of which shall survive such termination in accordance with its terms.

D. This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania without regard to its conflict of laws provisions.

E. Each section and each provision of this Agreement shall be considered severable, and if for any reason any section or provision is determined to be invalid or unenforceable by a court of competent jurisdiction, such invalidity or unenforceability shall not impair or otherwise affect the validity or enforceability of the other sections and provisions of this Agreement.

F. The headings of the sections are for convenience of reference only and shall not control or affect the meaning or construction or limit the scope or intent of any of the provisions of this Agreement.

[Remainder of Page Intentionally Left Blank. Signature Page Follows.]

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

COMPANY:                                     EMPLOYEE:
**MITCHELL & NESS NOSTALGIA COMPANY**

By: _____                 _____
Name: Peter Capolino                         _REUBEN HARLEY_
Title: President                             Print Name

# Attachment 1

## Employment Agreement

This <u>Attachment 1</u> is made a part of and incorporated into that certain Employment Agreement by and between the parties set forth below (the "Agreement"). Capitalized terms not defined herein shall have the meanings ascribed to them in the Agreement. To the extent that any conflicts exist between <u>Attachment 1</u> and the Agreement, the Agreement shall control.

1. <u>Parties</u>.

    Company: Mitchell & Ness Nostalgia Company

    Employee: Reuben Harley
    317 North Broad Street
    Apt. 517
    Philadelphia, PA 19107

2. <u>Title; Duties</u>. Employee's title shall be that of Vice President, Marketing, Promotions, Public Relations. The duties and responsibilities of Employee are as set forth in the foregoing Agreement and may include, but shall not be limited to, the following:

    To coordinate Public Relations activities, make personal appearances on the company's behalf and attend company approved outside events such as music award shows, professional sports events, and other approved events that give Mitchell & Ness an opportunity for branding exposure; and to consult at various staff, merchandising, and management meetings.

3. <u>Salary</u>. Employee shall be paid during the period of his employment with the Company a salary at a rate of $160,000 per year ("Salary"). The foregoing compensation shall be paid on a semi-monthly basis and will be prorated for any partial periods, as applicable.

4. <u>Applicable Policies and Procedures</u>. Employee's employment under the foregoing Agreement shall be subject to the following personnel policies and procedures of the Company, as they exist now or may be amended from time to time, as well as any other applicable policies, practices, or procedures as provided in the Agreement:

    - Policies in employee manual;

    - Dress Code: Mitchell & Ness licensed or branded apparel during all scheduled public appearances;

    - Executive code of conduct to include no criminal conduct or professional or business link to any criminal activities;

- To qualify for reimbursement, Employee's business expenses must be handled in accordance with Section 3 of the Agreement;

- Employee's "free goods" budget for promotional purposes must be pre-approved in writing on a monthly basis;

- Auto expenses for Company activities must be submitted at least monthly to qualify for reimbursement. Mileage, gas and parking must be submitted in detail on Company Expense form. Daily personal parking will not be covered.

- To qualify for reimbursement, the written receipt for any Company expenses charged on Employee's personal credit card must be submitted with Company Expense form;

- The Company will only pay the expense for personal electronic devices that are used specifically in conjunction with Employee's duties as provided herein and in the Agreement. Business cell phones, blackberry, and any other electronic device that accumulates corporate information such as contacts and email addresses to be downloaded monthly into our system by M&N IT Department.

- An inventory of all Company electronic equipment to include laptop computer, cameras and other devices to be made and accounted for as of Agreement Date;

- Employee shall have no authority to commit the Company to any party, promotion, outside event or advertising campaign without the prior written mutual agreement of Employee and Company.

[Remainder of Page Intentionally Left Blank]

The Parties have executed this <u>Attachment 1</u> in connection with the Agreement.

**COMPANY:**
**MITCHELL & NESS NOSTALGIA**
**COMPANY**

By: _____

Name: Peter Capolino

Title: President

**EMPLOYEE:**

_____

_____
Print Name

<u>Attachment 2</u>

<u>Employment Agreement</u>

**CONFIDENTIALITY, NONDISCLOSURE AND NONCOMPETITION AGREEMENT**

THIS AGREEMENT is entered into, with the intention of being legally bound hereby and having the opportunity for advice of legal counsel, by the undersigned ("Undersigned") and the Company to induce the Company to employ the Undersigned. This <u>Attachment 2</u> is made a part of and incorporated into that certain Employment Agreement by and between the parties set forth below (the "Agreement"). Capitalized terms not defined herein shall have the meanings ascribed to them in the Agreement. To the extent that any conflicts exist between <u>Attachment 2</u> and the Agreement, the Agreement shall control.

1. **Definitions.**

A. **Company defined.** The term "Company" shall include Mitchell & Ness and Mitchell & Ness Nostalgia Company, and any and all of their respective parent(s), subsidiary(s) joint venture(s), assign(s), heir(s) and affiliate(s).

B. **Business defined.** The term "Business" shall mean designing, manufacturing, marketing and distributing licensed replica sports apparel and branded sportswear, outerwear and accessories.

2. **Confidentiality and Nondisclosure.** Undersigned recognizes and acknowledges that the Company's trade secrets and customer lists as they exist from time to time and non-public information concerning, among other things, the Company's services, methods of operation, technical information and processes, inventions, ideas, products, specifications, trade secrets, formulae, pricing, commissions, bids, customers, sales activities and procedures (collectively the "Proprietary Information") are valuable, special and unique assets of the Company, access to and knowledge of which are essential to the performance of Undersigned's duties hereunder. In light of the highly competitive nature of the industry in which the Company conducts its businesses, Undersigned agrees that all Proprietary Information heretofore or in the future obtained by Undersigned as a result of or in connection with Undersigned's association with the Company shall be considered confidential. In recognition of this fact, Undersigned agrees that, so long as the Proprietary Information does not otherwise become publicly available, he will not, at any time, whether during or after his employment with the Company, directly or indirectly disclose any of such non-public Proprietary Information, without the written consent of the Company, to any person, firm, corporation, association or other entity for any reason or purpose whatsoever except in connection with the furtherance of the Business of the Company, and he will not make use of any Proprietary Information for his own purposes or for the benefit of any other person or entity (except the Company) under any circumstances.

3. **Restrictive Covenants.**

(a) In recognition of the highly competitive nature of the Company's Business, and except as set forth in Section 3(c) below, Undersigned agrees that he shall not,

directly or indirectly, during the period of his employment with the Company and for one year thereafter in any state in the United States:

> (i) engage or participate in any business activity competitive with the Company's Business, the business of any of the Company's subsidiaries, or the business of any of the Company's affiliates as same are conducted during the Term or during any period that Undersigned remains employed by the Company or upon the termination of Undersigned's employment with respect to any period thereafter;

> (ii) become interested in (as owner, stockholder, lender, partner, co-venturer, director, officer, employee, agent, consultant or otherwise) any person, firm, corporation, association or other entity engaged in any business that is competitive with the Business of the Company, of any subsidiary of the Company, or of any affiliate of the Company as conducted during the Term or during any period that Undersigned remains employed by the Company, or become interested in (as owner, stockholder, lender, partner, co-venturer, director, officer, employee, agent, consultant or otherwise) any portion of the business of any person, firm, corporation, association or other entity where such portion of such business is competitive with the Business of the Company, of any subsidiary of the Company or affiliate of the Company as conducted during the Term or any period that Undersigned remains employed by the Company or upon the termination of Undersigned's employment with respect to any period thereafter. Notwithstanding the foregoing, Undersigned may hold not more than one percent (1%) of the outstanding securities of any class of any publicly-traded securities of a company that is engaged in activities referenced in this Section 3(a)(ii).

> (iii) assist or cause any other person to engage in any activities prohibited to Undersigned under this Agreement.

(b) In recognition of the highly competitive nature of the Company's Business, Undersigned agrees that he shall not, directly or indirectly, during the period of his employment with the Company and for two years thereafter in any state in the United States:

> (i) solicit or call on, for competitive purposes, either directly or indirectly, any (A) customer or prospective customer with whom the Company shall have sold or offered to sell products to at any time during the period of Undersigned's employment or (B) any supplier or prospective supplier with whom the Company shall have purchased, been solicited to or offered to purchase products from at any time during the Term or any period that Undersigned remains employed by the Company or upon the termination of Undersigned's employment with respect to any period thereafter;

> (ii) directly or indirectly (A) influence or attempt to influence any person to terminate or modify his employment, consulting, agency, supplier, distributorship, or other agreement arrangement with the Company, or (B) employ or retain, or arrange to have any other person or entity employ or retain, any

person who has been employed or retained by the Company as an employee, consultant, agent, supplier or distributor of the Company at any time during the Term or any period that Undersigned remains employed by the Company or upon the termination of Undersigned's employment hereunder with respect to any period thereafter; nor

(iii) assist or cause any other person to engage in any activities prohibited to Undersigned under this Agreement.

(c) The restrictive covenant provisions in Section 3(a) shall not preclude Undersigned from directly or indirectly owning the "R. Harley" brand (whether during or after the end of the Undersigned's employment with the Company) or from engaging in the clothing or sportswear business under the "R. Harley" brand at any time following the end of Undersigned's employment with the Company for any reason (whether by expiration of the Term or termination); provided that, for the purpose of clarity only, nothing in this Section 3(c) shall be deemed to limit the application of: (i) Section 2 of the Agreement during any period that Undersigned is employed by the Company, (ii) Section 3(b) or (iii) any other provision of this Agreement.

Undersigned acknowledges and agrees that the Company conducts business nationally throughout the United States. Undersigned further acknowledges and agrees to the reasonableness of this covenant not to compete and the reasonableness of the geographic area and duration which are part of said covenant. Undersigned represents and warrants to the Company that, notwithstanding the operation of any covenants contained in this Agreement, upon the termination of his employment hereunder, Undersigned will be able to become gainfully employed in other businesses for the purpose of earning a livelihood.

4. **Company's Right to Documents.** Undersigned agrees that upon termination of his employment with the Company he shall turn over to the Company all documents, papers, records, files, computer discs, drawings, sketches, plans, specifications, manuals, models, equipment, machines, devices, computer data, or other written or graphic material (regardless of medium) which contain or are derived from Proprietary Information (collectively "Documents"), together with all other work product and materials connected with or derived from Undersigned's employment by the Company. Undersigned agrees that he shall have no proprietary interest in any work product used or developed by Undersigned and arising out of his employment with the Company.

5. **Secrecy Agreements.** Undersigned agrees to comply fully with all confidentiality or secrecy provisions or agreements binding on the Company with respect to services provided to its customers and to sign agreements providing that Undersigned is familiar with such provisions or agreements and is bound thereby.

6. **Company's Right to Inventions.** Undersigned agrees to disclose promptly and fully in writing to the Company or its nominee any and all works, inventions, discoveries, creations technical information and improvements authored, conceived or made by Undersigned, whether alone or jointly with others, prior to or during the term of the Agreement (the "Creations"), and Undersigned hereby assigns, transfers and conveys, and agrees to assign,

transfer and convey, its interest in any and all Creations (whether or not so disclosed) related to, derived from or associated in any way to the Undersigned's duties (the "Assigned Creations") to the Company or its nominee. All patents upon such creations shall be the sole and exclusive property of the Company. Whenever requested to do so by the Company, Undersigned agrees to cooperate with and assist the Company in securing and protecting interests in patents arising from the Assigned Creations. In connection therewith, Undersigned shall execute any and all applications, assignments or other instruments which the Company shall deem necessary to apply for and obtain letters patent or copyrights of the United States or any foreign country or to otherwise protect the Company's interest therein. Undersigned further agrees that all copyrightable works created by the Undersigned or under the Company's direction in connection with the Company's business are "works made for hire" and shall be the sole and complete property of the Company and that any and all copyrights to such works shall belong to the Company. To the extent such works are not deemed to be "works made for hire," Undersigned hereby assigns all proprietary rights, including copyright, in these works to the Company without further compensation.

7. **Continuing Obligations.** Undersigned agrees to honor and abide by the foregoing obligations following termination of his employment by the Company (whether such termination is voluntary or involuntary, with or without cause), which shall be binding upon Undersigned's heirs, successors and assigns. Any questions as to whether Undersigned may disclose or use particular information must be resolved by the Company in writing.

8. **Enforcement by heirs, successors, assigns and affiliates.** Undersigned agrees that this Agreement may, at the sole option of Company, be assigned by Company. Undersigned further acknowledges that the terms of this Agreement shall be binding upon him in any proceeding brought by or on behalf of the Company, its heirs, successors, assigns, subsidiaries, parents and/or affiliates.

9. **Interpretation.** It is expressly understood and agreed that although Undersigned and the Company consider the restrictions set forth above reasonable for the purpose of preserving for the Company its proprietary rights, business value as a going concern and goodwill, if a final judicial determination is made by a court having jurisdiction that any restriction set forth above is an unenforceable restriction against Undersigned, such restriction shall not be rendered void but shall be deemed amended to apply as to such maximum extent as such court may judicially determine or indicate to be reasonable. Alternatively, if the court referred to above finds that any restriction set forth above is unenforceable, and such restriction cannot be amended so as to make it enforceable, such finding shall not affect the enforceability of any of the other restrictions contained herein.

[Remainder of Page Intentionally Left Blank. Signature Page Follows.]

Undersigned has carefully read all provisions of this Agreement and agrees that all of the restrictions set forth are fair and reasonable and are reasonably required for the protection of the interests of the Company.


**COMPANY:**
**MITCHELL & NESS NOSTALGIA**
**COMPANY**

By: _____

Name:  Peter Capolino

Title:  President

**EMPLOYEE:**

_____

_REUBEN HARLEY_

Print Name