# Exhibit G

# MITCHELL & NESS NOSTALGIA COMPANY

## SUBSCRIPTION AGREEMENT

Mitchell & Ness Nostalgia Company
121 S. Broad Street
4th Floor
Philadelphia, PA 19107

Ladies and Gentlemen:

      1. <u>Subscription</u>. The undersigned (the "Purchaser"), intending to be legally bound, hereby agrees to purchase from Mitchell & Ness Nostalgia Company (the "Company"), and the Company agrees to issue, sell and deliver to the Purchaser, certain of the Company's shares of common stock are set forth on <u>Schedule 1</u> hereto (the "Shares") in consideration of the subscription dollar amount, assets or other value set forth on <u>Schedule 1</u> hereto (the "Subscription Price"). This subscription is submitted to the Company in accordance with and subject to the terms and conditions described in this Subscription Agreement.

      2. <u>Representations, Warranties, Acknowledgements and Agreements of the Purchaser</u>. The Purchaser hereby acknowledges, represents, warrants and agrees as follows:

      (a) The Shares are not, and will not be registered under the Securities Act of 1933, as amended (the "Securities Act"), or any state securities laws. The Purchaser understands that the offering and sale of the Shares is intended to be exempt from registration under the Securities Act, by virtue of Section 4(2) and/or Section 4(6) thereof and/or the provisions of Regulation D promulgated thereunder, based, in part, upon the representations, warranties and agreements of the Purchaser contained in this Subscription Agreement.

      (b) Neither the Securities and Exchange Commission nor any state securities commission has approved the Shares or passed upon or endorsed the merits of the offering of the Shares by the Company.

      (c) The Purchaser is acquiring the Shares solely for such Purchaser's own account for investment and not with a view to resale or distribution thereof, in whole or in part. The Purchaser has no contract, undertaking, agreement or arrangement, formal or informal, oral or written, with any person to sell or transfer all or any part of the Shares, and the Purchaser has no plans to enter into any such contract, undertaking, agreement or arrangement.

      (d) The Purchaser is aware that the Shares will be, "restricted securities," and the Purchaser must bear the substantial economic risks of the investment in the Shares indefinitely because the Shares may not be sold, hypothecated or otherwise disposed of unless

subsequently registered under the Securities Act and applicable state securities laws or an exemption from such registration is available. The Company has not agreed to make available an exemption from the registration requirements of the Securities Act for resale of the Shares and is under no obligation to register the Shares under the Securities Act or any state securities laws.

(e) Legends will be placed on the Shares to the effect that it has not been registered under the Securities Act or applicable state securities laws and appropriate notations thereof will be made in the Company's stock books, if such books are kept. It is not anticipated that there will be any market for resale of the Shares, and the Shares will not be freely transferable at any time in the foreseeable future.

(f) The Purchaser meets the requirements of at least one of the suitability standards for an "accredited investor" as defined in Rule 501(a) of Regulation D under the Securities Act and as set forth on the Accredited Investor Certification attached hereto as Schedule 2. The Purchaser has marked thereon which of such suitability standards is applicable to the Purchaser. The Purchaser agrees to furnish any additional information requested by the Company to assure compliance with applicable federal and state securities laws in connection with the purchase and sale of the Shares.

(g) The Purchaser has such knowledge and experience in business, financial and investment matters so that the Purchaser is capable of evaluating the merits and risks of an investment in the Shares.

(h) The Purchaser has had a reasonable opportunity to ask questions of and receive answers from a person or persons acting on behalf of the Company concerning the Company and the offering of the Shares and all such questions have been answered to the full satisfaction of the Purchaser.

(i) To the full satisfaction of Purchaser, the Purchaser has been furnished any materials the Purchaser has requested relating to the Company or the offering of the Shares. The Purchaser has received, has read carefully and understands all such materials and this Subscription Agreement. The Purchaser is familiar with the business and financial condition, properties, operations and prospects of the Company.

(j) Other than as set forth or referred to herein, the Purchaser is not relying upon any other information, representation or warranty by the Company or any representative of the Company in determining to invest in the Company. The Purchaser has consulted to the extent deemed appropriate by the Purchaser with the Purchaser's own advisers as to the financial, tax, legal and related matters concerning an investment in the Shares and on that basis believes that an investment in the Shares is suitable and appropriate for the Company.

(k) An investment in the Company is highly speculative and involves a risk of loss of the entire investment and no assurance can be given of any income from such investment.

(l) The Purchaser has taken no action which would give rise to any claim by any person for brokerage commissions, finders' fees or the like relating to this Subscription Agreement or the transactions contemplated hereby.

(m) If the Purchaser is not a natural person, (i) the Purchaser has the power and authority to execute this Subscription Agreement and to perform its obligations hereunder and consummate the transactions contemplated hereby and (ii) the person signing this Subscription Agreement on behalf of the Purchaser has been duly authorized to execute and deliver this Subscription Agreement. If the Purchaser is an individual, the Purchaser has all requisite legal capacity to acquire and hold the Shares and to execute, deliver and comply with the terms of this Subscription Agreement. The execution and delivery by the Purchaser, and compliance by the Purchaser with, this Subscription Agreement does not conflict with, or constitute a default under, any instruments governing the Purchaser, any law, regulation or order, or any agreement to which the Purchaser is a party or by which the Purchaser is bound. The Subscription Agreement has been duly executed by the Purchaser and constitutes the legal, valid and binding agreement of the Purchaser, enforceable against the Purchaser in accordance with its terms.

(n) If the Purchaser is, or is acting on behalf of, (i) an employee benefit plan within the meaning of Section 3(3) of the United States Employee Retirement Income Security Act of 1974, as amended ("ERISA"), (ii) an insurance company using general account assets which may be deemed to be the assets of such employee benefit plan pursuant to *John Hancock Mutual Life Insurance Company v. Harris Trust & Savings Bank*, 114 S.Ct. 517 (1993) or otherwise or (iii) an entity which is deemed to hold the assets of any such employee benefit plan pursuant to 29 C.F.R. §2510.3-101, which plan, general account or entity is subject to Title I of ERISA or Section 4975 of the United States Internal Revenue Code of 1986, as amended (the "Code"") (collectively, a "Plan"): (1) the decision to invest in the Company was made by a fiduciary (within the meaning of Section 3(21) of ERISA and the regulations thereunder) (a "Fiduciary") of the Plan which is unrelated to the Company or any of its employees, representatives or affiliates and which is duly authorized to make such an investment decision on behalf of the Plan (the "Plan Fiduciary"); (2) the Plan Fiduciary has taken into consideration its fiduciary duties under ERISA, including the diversification requirements of Section 404(a)(1)(c) of ERISA, in authorizing the Plan's investment in the Company, and has concluded that such investment is prudent, (3) the Plan's subscription to invest in the Company and to purchase the Shares is in accordance with the terms of the Plan's governing instruments and complies with all applicable requirements of ERISA and the Code; and (4) the Plan Fiduciary acknowledges and agrees that neither the Company nor any of its employees, representatives or affiliates will be a fiduciary with respect to the Plan as a result of the Plan's investment in the Company, and the Plan Fiduciary has not relied on, and is not relying on, the investment advice of any such person with respect to the Plan's investment in the Company.

(o) The Purchaser's domicile is at the address set forth on the signature page hereof.

3. <u>Representations and Warranties of the Company</u>. The Company represents and warrants that:

(a) The Company is a corporation duly incorporated, validly existing, and in good standing under the laws of the Commonwealth of Pennsylvania. The Company is duly qualified to do business and in good standing in every state in which the Company is required to be so qualified unless failure to do so will not have, subject to any applicable cure or grace periods, a material adverse effect upon any of (i) the financial condition, operations, business, or properties of the Company, (ii) the ability of the Company to perform its material obligations under this Subscription Agreement or (iii) the legality, validity or enforceability of this Subscription Agreement. The Company has the requisite power and authority to own, lease and operate its properties and assets and to carry on its business as presently conducted and as proposed to be conducted, enter into and perform its obligations under this Subscription Agreement.

(b) All corporate action on the part of the Company necessary for the execution, delivery and performance of this Subscription Agreement and the sale and issuance of the Shares has been duly and validly taken. This Subscription Agreement is the valid and binding obligation of the Company enforceable against the Company in accordance with its terms except as such enforceability may be limited by bankruptcy, insolvency or similar laws and by equitable principles.

(c) The issuance and sale of the Shares is not subject to any preemptive right of the shareholders of the Company or to any right of first refusal or other right in favor of any person. All of the issued and outstanding Shares of the Company are duly authorized and validly issued, fully paid and non-assessable.

(d) The execution, delivery and performance of this Agreement by the Company will not result in a breach or violation of any provisions of its Articles of Incorporation or Bylaws, or of any provision of any material instrument or contract to which it is a party, or of any provision of any federal or state judgment, writ, decree, order, statute, rule or governmental regulation applicable to the Company.

(e) The Company has not been made a party to or, to its knowledge, been threatened by any suits, actions, claims, investigations by any federal, state or local governmental or quasi-governmental instrumentality, agency, board, commission or department or any regulatory agency, bureau, commission or authority or legal, administrative, arbitration or mediation proceedings. The Company does not know of any reasonable basis or grounds for any such suit, action, claim, investigation or proceeding.

4. <u>Indemnification</u>. The Purchaser agrees to indemnify and hold harmless the Company, and its respective partners, officers, directors, employees, agents, control persons and affiliates against all losses, liabilities, claims, damages, and expenses whatsoever (including, but not limited to, any and all expenses incurred in investigating, preparing, or defending against any litigation commenced or threatened) based upon or arising out of any actual or alleged false

acknowledgment, representation or warranty, or misrepresentation or omission to state a material fact, or breach by the Purchaser of any covenant or agreement made by the Purchaser herein or in any other document delivered in connection with this Subscription Agreement.

5. <u>Irrevocability: Binding Effect</u>. The Purchaser hereby acknowledges and agrees that the subscription hereunder is irrevocable by the Purchaser, except as required by applicable law, and that this Subscription Agreement shall survive the death or disability of the Purchaser and shall be binding upon and inure to the benefit of the parties and their heirs, executors, administrators, successors, legal representatives, and permitted assigns. If the Purchaser is more than one person, the obligations of the Purchaser hereunder shall be joint and several and the agreements, representations, warranties, and acknowledgments herein shall be deemed to be made by and be binding upon each such person and such person's heirs, executors, administrators, successors, legal representatives, and permitted assigns.

6. <u>Modification</u>. This Subscription Agreement shall not be modified or waived except by an instrument in writing signed by the party against whom any such modification or waiver is sought.

7. <u>Notices</u>. Any notice or other communication required or permitted to be given hereunder shall be in writing and shall be made by certified mail, return receipt requested, or delivered against receipt to the party to whom it is to be given (a) if to the Company, at the address set forth above, or (b) if to the Purchaser, at the address set forth on the signature page hereof (or, in either case, to such other address as the party shall have been in writing in accordance with the provisions of this Section 7). Any notice or other communication given by certified mail shall be deemed given at the time of certification thereof, except for a notice changing a party's address which shall be deemed given at the time of receipt thereof.

8. <u>Assignability</u>. This Subscription Agreement and the rights, interests and obligations hereunder are not transferable or assignable by the Purchaser and the transfer or assignment of the Shares shall be made only in accordance with all applicable laws.

9. <u>Applicable Law</u>. THIS SUBSCRIPTION AGREEMENT SHALL BE GOVERNED AND CONSTRUED AS TO ITS VALIDITY, INTERPRETATION AND EFFECT BY THE LAWS OF THE COMMONWEALTH OF PENNSYLVANIA NOTWITHSTANDING THE CHOICE OF LAW RULES OF PENNSYLVANIA OR ANY OTHER JURISDICTION. IN ADDITION, IN THE CASE OF ANY DISPUTE UNDER OR IN CONNECTION WITH THIS SUBSCRIPTION AGREEMENT, THE PURCHASER CONSENTS TO THE EXCLUSIVE JURISDICTION AND VENUE OF THE COURTS OF THE COMMONWEALTH OF PENNSYLVANIA IN AND FOR THE COUNTY IN WHICH THE COMPANY MAINTAINS ITS REGISTERED OFFICE OR THE FEDERAL DISTRICT COURT FOR SUCH GEOGRAPHIC LOCATION, PROVIDED THAT SUCH FEDERAL COURT HAS SUBJECT MATTER JURISDICTION OVER SUCH DISPUTE, AND THE PURCHASER AND THE COMPANY EACH WAIVE ANY CLAIM IT MAY HAVE AT ANY TIME AS TO <u>FORUM</u> <u>NON</u> <u>CONVENIENS</u> WITH RESPECT TO SUCH VENUE.

10. <u>Blue Sky Qualification</u>. The purchase of the Shares under this Subscription Agreement is expressly conditioned upon the exemption from qualification of the offer and sale of the Shares from applicable Federal and state securities laws. The Company shall not be required to qualify this transaction under the securities laws of any jurisdiction and, should qualification be necessary, the Company shall be released from any and all obligations to maintain its offer, and may rescind any sale contracted, in the jurisdiction.

11. <u>Miscellaneous</u>.

(a) This Agreement constitutes the entire agreement between the Purchaser and the Company with respect to the subject matter hereof and supersedes all prior oral or written agreements and understandings, if any, relating to the subject matter hereof. The terms and provisions of this Agreement may be waived, or consent for the departure therefrom granted, only by a written document executed by the party entitled to the benefits of such terms or provisions.

(b) The Purchaser's representations and warranties made in this Subscription Agreement shall survive the execution and delivery hereof and delivery of the Shares.

(c) Each of the parties hereto shall pay its own fees and expenses (including the fees of any attorneys, accountants, appraisers or others engaged by such party) in connection with this Subscription Agreement and the transactions contemplated hereby whether or not the transactions contemplated hereby are consummated.

(d) This Agreement may be executed in one or more counterparts (including by facsimile signature) each of which shall be deemed an original, but all of which shall together constitute one and the same instrument.

(e) Each provision of this Subscription Agreement shall be considered separable and if for any reason any provision or provisions hereof are determined to be invalid or contrary to applicable law, such invalidity or illegality shall not impair the operation of or affect the remaining portions of this Subscription Agreement.

(f) Paragraph titles are for descriptive purposes only and shall not control or alter the meaning of this Subscription Agreement as set forth in the text.

[Signature Page Follows]

IN WITNESS WHEREOF, the Purchaser has executed this Subscription Agreement on the date set forth below.

_REUBEN HARLEY_
Print Name(s)

_Reuben Harley_
Signature of Purchaser(s)

_6-30-05_
Date

_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_
Social Security Number(s)

_270 S. ITHAN St_
_Phila, PA. 19139_
Address

If the purchaser is a PARTNERSHIP, CORPORATION, LIMITED LIABILITY COMPANY OR TRUST:

_____
Name of Partnership, Corporation,
Limited Liability Company or Trust

By:_____
Name:_____
Title:_____

_____
Date

_____
Federal Taxpayer I.D. No.

_____
State of Organization

_____
Address

ACCEPTED AND AGREED TO on June _30_, 2005.

**Mitchell & Ness Nostalgia Company**

By:_____ _P N L_____
Name:_____ _PETER CAPOLINO_
Title:_____ _PRESIDENT_

## Schedule 1

| Subscription Price ($) | Number of Shares |
|---|---|
| n/a | 11.11 |

## Schedule 2

## ACCREDITED INVESTOR CERTIFICATION
(Check the appropriate box(es))

_____ (i)   The Purchaser is natural person who had individual income of more than $200,000 in each of the most recent two years or joint income with his or her spouse in excess of $300,000 in each of the most recent two years and reasonably expects to reach that same income level for the current year ("income", for purposes hereof, should be computed as follows: individual adjusted gross income, as reported (or to be reported) on a federal income tax return, increased by (1) any deduction of long-term capital gains under Section 1202 of the Internal Revenue Code of 1986 (the "Code"), (2) any deduction for depletion under Section 611 *et seq.* of the Code, (3) any exclusion for interest under Section 103 of the Code and (4) any losses of a partnership as reported on Schedule E of Form 1040);

_____ (ii)   The Purchaser is a natural person whose individual net worth (i.e., total assets in excess of total liabilities), or joint net worth with his or her spouse, will at the time of purchase of the Shares be in excess of $1,000,000;

_____ (iii)   The Purchaser is a bank as defined in Section 3(a)(2) of the Securities Act of 1933, as amended (the "Act"), or a savings and loan association or other institution as defined in Section 3(a)(5)(A) of the Act, whether acting in its individual or fiduciary capacity; an insurance company as defined in Section 2(13) of the Act; an investment company registered under the Investment Company Act of 1940 (the "1940 Act") or a business development company as defined in Section 2(a)(48) of the 1940 Act; a Small Business Investment Company licensed by the U.S. Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958; or an employee benefit plan within the meaning of Title I of the Employee Retirement Income Security Act of 1974 ("ERISA"), if the investment decision is made by a plan fiduciary, as defined in Section 3(21) of ERISA, which is either a bank, savings and loan association, insurance company or registered investment adviser, or if the employee benefit plan has total assets in excess of $5,000,000 or if a self-directed plan, with investment decisions made solely by persons that are accredited investors;

_____ (iv)   The Purchaser is a private business development company as defined in Section 202(a)(22) of the Investment Advisers Act of 1940;

_____ (v)   The Purchaser is an organization described in Section 501(c)(3) of the Internal Revenue Code, corporation, Massachusetts or similar business trust, or partnership, not formed for the specific purpose of acquiring the Shares, with total assets in excess of $5,000,000;

_X_ (vi)    The Purchaser is an individual who is a director or executive officer of the Company;

____ (vii)   The Purchaser is a trust, which trust has total assets in excess of $5,000,000, which is not formed for the specific purpose of acquiring the Shares offered hereby and whose purchase is directed by a sophisticated person as described in Rule 506(b)(ii) of Regulation D and who has such knowledge and experience in financial and business matters that he is capable of evaluating the risks and merits of an investment in the Shares; or

____ (viii)  The Purchaser is an entity (other than a trust) in which each of the equity owners meets the requirements of at least one of the above subparagraphs